UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

STEVEN A. OLSEN,                      )
                                     )
            Plaintiff,               )
                                     )
      vs.                            )          Case No. 4:08-CV-1442 (CEJ)
                                     )
SOCIAL SECURITY ADMINISTRATION,      )
                                     )
            Defendant.               )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social

Security Administration.

## I. Procedural History

On or around April 18, 2006, plaintiff Steven A. Olsen filed applications for

disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401

*et seq.*, and for supplemental security income (SSI) under Title XVI of the Act, 42

U.S.C. §§ 1381 *et seq.*, with an alleged onset date of January 17, 2006. (Tr. 91-93,

94-98, 114). After plaintiff's applications were denied on initial consideration (Tr. 63-

67), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 68).

The hearing was held on December 18, 2007. Plaintiff was represented by

counsel. (Tr. 29-53). The ALJ issued a decision on January 22, 2008, denying

plaintiff's claims. (Tr. 7-28). The Appeals Council denied plaintiff's request for review

on July 10, 2008. (Tr. 1-3). Accordingly, the ALJ's decision stands as the

Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

The ALJ received testimony from the plaintiff, who was 57 years old at the time

of the hearing. (Tr. 32). He had completed 12 years of education. Plaintiff was in the

Marine Corps between 1969 and 1971 and was deployed to Okinawa and Vietnam. (Tr. 35).  At the time of the hearing, he lived alone in an apartment in Farmington, Missouri; he paid the rent with the pension he received from the Veteran's Administration (VA).  (Tr. 34).  Plaintiff's brothers and mother live in the western United States and he does not see them often.  He was not married and did not have a girlfriend.  (Tr. 92, 49).  Plaintiff's sixteen-year-old son lives with his grandparents. (Tr. 34).

Plaintiff was last employed for four or five months as a machine operator, using a multi-head sewing machine to make emblems.  (Tr. 36).  He described the job as very stressful.  He testified that he missed a lot of work and then was fired.  (Tr. 51). Plaintiff also worked as a security guard for three or four months (Tr. 16); he lost that job when he was in intensive care for several months.  (Tr. 51).  Plaintiff worked as an over-the-road truck driver for about 18 years.  (Tr. 36).

Plaintiff testified that he can no longer work because he is physically weak and tired and can no longer bend or kneel.  His short-term memory is poor, making it difficult for him to retain work-related information.  (Tr. 41).  He has a very hard time dealing with stress.  (Tr. 38).  He also cited daily bouts of diarrhea and a history of seizures as barriers to working.  (Tr. 49-50).  Plaintiff was asked about a note in his VA record reporting that he had said he would rather receive disability than have to work.  When asked whether this was true, plaintiff stated that he had assumed he would work his entire life.  He would continue to work if he could, he stated, but he felt "lousy most of the time."  (Tr. 44).

In January 2006, plaintiff lost his balance and fell, fracturing his left ankle.  He underwent surgery to install screws and a plate.  He experiences pain when standing or walking and reported that he uses a cane when walking longer distances.  (Tr. 39).

-2-

He stops to rest when he walks to the convenience store because he gets tired, runs out of breath and his leg starts bothering him "a little." (Tr. 45). He has difficulty carrying his groceries home from the store. (Tr. 47). He can sit for two or three hours to watch television. He has difficulty falling asleep and often wakes after four hours. Sleeping pills provide little relief and he is constantly tired. (Tr. 45-46). He lies down twice a day for about an hour. (Tr. 46). When asked about household chores, plaintiff stated he can do cleaning that doesn't require him to kneel. He no longer cooks, he stated, because it "gets frustrating" and because he frequently has an upset stomach. (Tr. 48, 34). He denied having any hobbies. He used to read but can no longer concentrate enough to do so. Id. He denied going out except to take a walk. (Tr. 49). He smokes about a half pack of cigarettes a day. (Tr. 52). He denied using illegal drugs. (Tr. 51).

Plaintiff attempted suicide on two occasions. (Tr. 46). He last felt suicidal about a year before the hearing. He stated that his depression had improved since he stopped being homeless. (Tr. 47). He lost his home in 2003 or 2004. (Tr. 49). Plaintiff acknowledged that he is an alcoholic. He stopped drinking about two months before the hearing because, he said, he had "a lot less stress in his life . . . and these things are getting better for me . . . I don't have any [job and family] pressures . . . I can pay my bills." (Tr. 40). Once he is alcohol-free for six months, he will be eligible to receive treatment for his hepatitis C. (Tr. 42).

The record includes an undated Disability Report completed by plaintiff. (Tr. 115-23). Plaintiff indicated that the conditions that keep him from working include the screws in his legs, severe depression, bipolar disorder, pain, hepatitis C, and cirrhosis. He indicated that he is unable to bend or kneel and can not stand or sit for long periods. (Tr. 115). His longest-held job was as a coast-to-coast truck driver. In

-3-

addition to driving, he loaded and unloaded the freight, which required him to lift up to 100 pounds.  (Tr. 118).  His medications at that time included Lexapro,[1] Oxycontin,[2] Percocet,[3] and Tramadol.[4]  (Tr. 121).

Anna Mann completed a Function Report on May 6, 2006.  (Tr. 132-40).  She identified herself as a friend who shared an apartment with him.[5]  (Tr. 132, 135).  Ms. Mann stated that plaintiff cannot lift heavy objects and is unable to bend or kneel; he has trouble walking due to pain in his feet and legs.  (Tr. 133).  He needs to wear a brace when walking.  (Tr. 138).  He prepares frozen dinners, sandwiches and soup and will do light cleaning.  (Tr. 134).  Ms. Mann described plaintiff's interests as watching television and listening to the radio.  (Tr. 136).  He frequently forgets about his medical appointments.  She stated that plaintiff has trouble getting along with others because "he does not like people and [doesn't] want to be around" them.  Id.  He does not engage in any social activities.  (Tr. 137).  Ms. Mann identified the following abilities affected by his condition: lifting more than 30 pounds, sitting more than five minutes, walking, squatting, kneeling, bending, standing, and memory.  He cannot finish what he starts and he does not get along "at all" with the police.  Id.  He cannot

---

[1]Lexapro, or Escitalopram, is used to treat depression and generalized anxiety disorder.  www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Nov. 6, 2009).

[2]Oxycontin, or oxycodone, is an opioid analgesic indicated for relief of moderate to moderately severe pain.  It can produce drug dependence.  See Phys. Desk. Ref. 1114 (60th ed. 2006).

[3]Percocet is a combination of Oxycodone and Acetaminophen.  Ocycodone is an opioid analgesic indicated for relief of moderate to moderately severe pain.  It can produce drug dependence.  See Phys. Desk. Ref. 1114 (60th ed. 2006).

[4]Tramadol is prescribed for treatment of moderate to moderately severe pain. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Nov. 6, 2009).

[5]Ms. Mann is identified as plaintiff's fiancee in some of the medical records. Plaintiff's relationship with Ms. Mann terminated between the time he filed for benefits and the time of the hearing.

handle stress "at all" and is "very moody, very unhappy, and depressed a lot." He got fired because he was depressed. (Tr. 138).

Plaintiff's Function Report largely coincides with that of Ms. Mann. (Tr. 152-59). He reported that his sleep is very restless and that he experiences pain when standing to shower or shave. (Tr. 153). He stated that he cannot afford his medication. (Tr. 154). He goes grocery shopping about once each week. Although he is able to handle a checking account and count change, he stated that his ability to handle money is reduced by his conditions because he cannot "think as well." (Tr. 155-56). He rarely goes anywhere and described his social activities as watching television. He stated that he does not get along with his family and had not spoken with them for seven months. (Tr. 156-57).

Plaintiff indicated that his conditions affect the following abilities: lifting 30 to 40 pounds, walking more than a tenth of a mile, climbing stairs, squatting, sitting, bending, kneeling, standing, using his hands, reaching, completing tasks, memory, understanding, concentrating for more than five minutes, and getting along with others. He can follow short, simple spoken instructions very well. (Tr. 157). He stated that he had lost jobs due to his inability to get along with others. He also stated that he does not handle changes in routine or stress well. In response to a question asking about "any unusual behavior or fears," plaintiff identified guilt, anger, and depression and stated that he is sometimes afraid to be seen or to go outside. (Tr. 158). In a Pain Questionnaire completed on May 3, 2006, plaintiff indicated that he has daily pain in his heels, ankles, knees, and back, with occasional pain in his neck and shoulders. Walking, standing, bending, and lifting all make the pain worse. (Tr. 160).

A wage report shows that plaintiff's annual earnings varied significantly from year to year. In 1972, plaintiff reported earnings of $5,290.03; his earnings for the next three years were significantly lower. In 1979, plaintiff earned $15,613.44; his wages increased each year through 1983, before dropping significantly. He had a brief period of improved wages between 1990 and 1992 and a more sustained period between 1996 and 2002. Plaintiff's highest annual earnings were $23,488.62, reported in 2000. (Tr. 112).

### III. Medical Evidence

Plaintiff was admitted to Castleview Hospital in Price, Utah, on November 19, 2004, with complaints of vomiting blood for more than four hours and bloody diarrhea. He reported that he had experienced similar symptoms three years earlier. (Tr. 179). He reported that he drank more than one pint of alcohol each day and complained of the effects of withdrawal. (Tr. 180). He was placed in the intensive care unit to monitor possible seizures resulting from alcohol withdrawal. (Tr. 181). An endoscopy indicated that plaintiff had esophageal varices,[6] Barrett's esophagus,[7] and tiny duodenal ulcers. He was discharged on November 23, 2004. (Tr. 178).

Plaintiff presented to the emergency department at St. Joseph Health Center in Wentzville, Missouri, on December 12, 2005, with suicidal thoughts. He denied having a current plan to harm himself. (Tr. 232-36). His last drink had been that morning.

---

[6]"Varices are dilated veins in the distal esophagus or proximal stomach caused by elevated pressure in the portal venous system, typically from cirrhosis. They may bleed massively but cause no other symptoms." The Merck Manual of Diagnosis and Therapy 92 (18th ed. 2006).

[7]"In Barrett's esophagus, a metaplastic, columnar, glandular, intestine-like mucosa replaces the stratified squamous epithelium of the distal esophagus during the healing phase of acute esophagitis." The Merck Manual of Diagnosis and Therapy 168 (18th ed. 2006).

(Tr. 234).   Plaintiff was seeking a detox program, but he refused an inpatient admission to a "psych unit."   (Tr. 236).

Plaintiff was admitted for inpatient treatment on December 20, 2005, after an assessment by his employer's Employee Assistance Program.   (Tr. 200-10, 201). Plaintiff complained of increased depression and  suicidal ideation.  He reported that he had been drinking a fifth of hard liquor each day; his blood alcohol level at admission was .218.  He stated that his longest period of sobriety in 2005 was two months.  He stated that he was under a lot of stress and had been missing work; he reported decreased sleep and lack of energy.   He reported that he had been contemplating an overdose on medication for about six months, although he denied active suicidal ideation at the time of admission.  He lived with his fiancee.  The admitting physician noted that plaintiff was alert and oriented to place and time; his concentration was fair and his insight and judgment were "partial to fair."  At intake, his Global Assessment (GAF)[8] score was 30.[9]  (Tr.  201).

During an examination conducted on December 21, 2005, plaintiff reported a history of self-inflicted stab wounds.  He began abusing alcohol in his early teens.  He continued to drink heavily even after being diagnosed with cirrhosis and hepatitis C. Plaintiff reported that he had been married and divorced twice and was the father of

---

[8]The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning.  Impairment in functioning due to physical or environmental limitations are not considered.   American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000).

[9]A GAF of 21-30 corresponds with "[b]ehavior . . . considerably influenced by delusions or hallucinations OR serious impairment in communications or judgment OR inability to function in all areas." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000).

two children. His physical complaints included hypertension and chronic back and knee pain. Id. (Tr. 203). Plaintiff's mood and behavior stabilized and he was discharged on December 24, 2005. His medications at discharge were Lexapro, Accupril,[10] folic acid, thiamin, and a multivitamin; plaintiff's girlfriend was directed to hold the prescription bottles "under lock and key." His discharge diagnoses were major affective disorder, depression, and alcohol dependence. His GAF score was 50.[11] (Tr. 200). He was referred for alcohol treatment. (Tr. 209).

Plaintiff was admitted to the hospital again on January 17, 2006, after he tripped and broke his left ankle. (Tr. 213-31). Surgery was performed to install a plate and screws to repair the ankle. The following day he reported some pain but was otherwise stable; that evening he was found crawling on the floor with hallucinations, thought to be caused by alcohol withdrawal. On January 25, 2006, plaintiff was transferred to the Blanchette Place Care Facility, with diagnoses of post-surgical ankle fracture, cirrhosis, hepatitis C, anemia, hypertension, hyperlipidemia, chronic low back pain, and depression with suicidal ideation. (Tr. 213, 247). Plaintiff was discharged from the facility on April 12, 2006. (Tr. 240).

Plaintiff was seen at the emergency room at St. Joseph Health Center on May 14, 2006. He had been found sleeping on the front lawn and was complaining of bilateral leg pain. (Tr. 282, 284). "Excellent relief" of the pain was obtained by removing the ankle brace he had "been wearing for days." (Tr. 283) (emphasis in original).

---

[10]Accupril, or Quinapril, is an ACE inhibitor prescribed to treat high blood pressure. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Nov. 6, 2009).

[11]A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social occupational, or school functioning." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

On June 13, 2006, plaintiff returned to the emergency room with self-inflicted superficial cuts to his neck and forearm. (Tr. 256-67). He was admitted for evaluation of depression and alcoholism on June 14, 2006. He had been homeless since his discharge from Blanchette Place and reported that "the police arrest him every day." He continued to consume alcohol at the rate of a pint to a fifth each day. (Tr. 261). He reported that he chronically feels low, suffers mood swings and anxiety, and is easily aggravated. He asked for help with entering a rehabilitation program. During a mental status examination, plaintiff appeared pleasant on approach with fair eye contact. His speech was fluent. He stated that his mood was better and he denied suicidal ideation at the moment. His affect was congruent and moderately dysphoric; his flow of thought was logical and sequential. He was alert and oriented, with poor concentration. His memory was assessed as "mildly decreased" and his IQ was estimated to be average. His insight and judgment were described as "fair." (Tr. 259). The treatment plan called for observation during detoxification and resumption of medications. Id. On June 15, 2006, plaintiff was assessed as "much improved" and safe to be discharged. He was instructed to follow up at the VA. His medications on discharge were Toprol[12] and Prozac[13]; his diagnoses were major depressive disorder and alcohol dependence. His GAF was 50. (Tr. 257-58).

Plaintiff was seen at the VA hospital on June 16, 2006. (Tr. 340-42). He presented as ambulatory with the use of a cane. He complained of severe depression for about a month and reported he was homeless since breaking up with his girlfriend. (Tr. 341). He stated that he had been depressed his entire life; it had become "really

---

[12]Toprol, or Metoprolol, is a beta blocker used to treat high blood pressure. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Nov. 6, 2009).

[13]Prozac is a psychotropic drug indicated for treatment of, *inter alia*, major depressive disorder. See Phys. Desk. Ref. 1772-72 (60th ed. 2006).

bad the last couple of years." He reported that he had quit intravenous heroin use twenty years earlier. He broke his right ankle in 1998 and his left ankle in 2006. (Tr. 604). He reported that he had attempted suicide by cutting his wrists and neck and that he failed only because the knife was dull. (Tr. 336-37). He stated that he felt hopeless and worthless and had no reason to live. He could no longer do work that required long periods of standing. He was described as polite and cooperative. (Tr. 336-37). His GAF was assessed as 25.[14] (Tr. 338).

Plaintiff was admitted to the VA Hospital. A nursing assessment form completed on June 16, 2006, indicated that plaintiff was alert, with stable but depressed mood and affect. His speech was coherent and unpressured. (Tr. 328). His thoughts were reality-based and there was no flight of ideas. He was oriented, with intact memory and attention. His ideation was normal. (Tr. 329). He reported difficulties falling asleep and staying asleep; he had nightmares twice a week. (Tr. 330). When asked to identify his strengths, plaintiff stated that he is a quick learner, (Tr. 332); he was assessed as having the judgment and cognitive ability to participate in his plan of care. (Tr. 336). He complained of "shooting, aching, burning" pain in his lower legs, which was made worse by standing and walking. (Tr. 332-33). Over the course of the next several days, plaintiff reported that he felt less depressed. (Tr. 317-18).

On June 19, 2006, plaintiff was screened for admission to the VA's substance abuse treatment program. Plaintiff decided he was not interested in the program when he was told that participants needed to be "work ready." (Tr. 303-04). Plaintiff was discharged from the hospital on June 21, 2006. A screening interview with a

---

[14]A GAF of 21-30 corresponds with "[b]ehavior . . . considerably influenced by delusions or hallucinations OR serious impairment in communications or judgment OR inability to function in all areas." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000).

residential treatment program was scheduled for the following day; plaintiff "was encouraged to utilize his personal relationship network as means of securing temporary housing" in the interim. (Tr. 300). His medications at discharge were Fluoxetine,[15] Metoprolol tartrate,[16] Tramadol, thiamine, and a multivitamin. (Tr. 298). Plaintiff was directed to continue his treatment on an outpatient basis. (Tr. 297).

Plaintiff was readmitted to the VA Hospital on July 7, 2006. (Tr. 372-79). He reported that he was homeless and continued to consume alcohol; he also tested positive for marijuana. He admitted to suicidal ideation but did not have a plan or intent. (Tr. 543, 555). He was oriented and alert; his hygiene was described as "surprisingly" good, "given his homeless status." He was wearing a splint on his right ankle. (Tr. 556). His GAF was assessed as 35.[17] (Tr. 557). Plaintiff was discharged on July 12, 2006. (Tr. 478).

Plaintiff was admitted again on July 14, 2006. (Tr. 467). He fell while intoxicated, requiring sutures to his scalp and lower back. (Tr. 471). He reported that his medications were not really helping his depression; he also complained of significant pain in his knees, shoulders, and left ankle. (Tr. 478). His diagnoses included major depression, recurrent in partial admission, alcohol dependence, alcohol intoxication, alcohol withdrawal, cannabis abuse, and personality disorder not otherwise specified with dependent features; his GAF was assessed at 35. (Tr. 474).

---

[15]Prozac, or fluoxetine, is a psychotropic drug indicated for treatment of, *inter alia*, major depressive disorder. See Phys. Desk. Ref. 1772-72 (60th ed. 2006).

[16]Metoprolol is a beta blocker used to treat high blood pressure. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Nov. 6, 2009).

[17]A GAF of 31-40 corresponds with "some impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

Plaintiff was discharged on July 18, 2006. (Tr. 443). He returned to have the sutures removed on July 20, 2006. (Tr. 439-40). On July 24, 2006, he reported to triage for treatment of abrasions and swelling to his hands, injuries he sustained when he fell down. (Tr. 436). It was determined that he had fractured one finger. (Tr. 351). Plaintiff requested a psychiatric evaluation and stated he had been having suicidal and homicidal thoughts. (Tr. 434).

Plaintiff was readmitted to the hospital on July 27, 2006, after complaining of depression with a suicide plan. (Tr. 415, 357). He was disheveled and complained of nausea, vomiting and diarrhea. (Tr. 359). His affect was flat. (Tr. 360). He reported that he had resumed alcohol consumption after his last discharge and that he was not fully compliant with his medications. He was admitted for further stabilization. (Tr. 357). He was admitted to the substance abuse treatment program. (See Tr. 728).

On September 28, 2006, plaintiff was brought to the emergency room by two police officers after making "some gesture" toward the patrol car. (Tr. 728). He reported that his psychiatric medications helped when he took them, but he was presently noncompliant, due to lack of income. He reported that he had been sober for one week following participation in the substance abuse treatment program. Id. He complained of feeling depressed. He was discharged on October 2, 2006, with diagnoses of major depressive disorder, recurrent, and alcohol dependence. His GAF was 50. (Tr. 727-28).

Plaintiff returned to the emergency room on October 6, 2006, complaining that he could not find any where to sleep or take a shower. (Tr. 721). He was allowed to eat and then was discharged. He returned two hours later complaining that he was suicidal. He also reported that he had stumbled and bumped his face against the wall.

Id. An x-ray revealed a hairline fracture of the nasal spine.  (Tr. 683).  A CT scan of the head revealed some swelling consistent with recent trauma.  (Tr. 684).

Plaintiff was admitted to the hospital on November 16, 2006, after he reported that he had had a seizure.  (Tr. 712).  The admission note states that plaintiff had been kicked out of a treatment program three days after admission and had been staying at the Salvation Army's respite program for two months.  He had been admitted to the VA's neurology service on November 9, 2006, after a seizure but left prematurely against medical advice.  On the day of admission, he had drunk a half pint of vodka, the first alcohol he had consumed in thirty days.  He reported that he had no desire to quit drinking.  He was hoping to become eligible for disability so that he would not have to work.  (Tr. 713).  On November 21, 2006, plaintiff was admitted to Marian Cliff Manor, a residential care facility.  (Tr. 639).

An MRI of plaintiff's brain was completed on December 14, 2006.  (Tr. 680).  It was noted that plaintiff had recent onset of seizures that might be due to alcohol withdrawal or to multiple head injuries he suffered in recent falls.  The MRI detected a lacunar infarction[18] involving the deep white matter of the right frontal lobe, adjacent to the frontal horn of the right lateral ventricle.  (Tr. 681).

At an office visit on January 23, 2007, plaintiff reported that he was depressed and experiencing suicidal ideation at times.  He declined inpatient admission.  He was prescribed Celexa[19] and was referred for therapy "ASAP."  (Tr. 658).  On February 7,

---

[18]"Lacunar infarcts occur in patients with nonatherothrombotic obstruction of the small, perforating arteries that supply deep cortical structures. . .  Lacunar infarcts tend to occur in elderly patients with diabetes or poorly controlled hypertension."  The Merck Manual of Diagnosis and Therapy, 1792 (18th ed. 2006).  Multiple lacunar infarcts may result in multi-infarct dementia.  Id. at 1793.

[19]Celexa, or Citalopram, is prescribed to treat depression. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Nov. 6, 2009).

2007, he reported improvement but still had mild depressive symptoms. His medications were continued. On March 14, 2007, plaintiff was assessed as doing well. (Tr. 657). On April 9, 2007, it was noted that plaintiff had experienced no seizures since he started taking Dilantin.[20] At an office visit on May 31, 2007, plaintiff admitted that he continued to drink. (Tr. 648-49). On June 11, 2007, he reported that he was depressed, with intermittent suicidal ideation. (Tr. 642). On July 11, 2007, plaintiff appeared for follow-up with the neurology department at the VA. He reported that he had not had any seizures since his last visit and that he had stopped drinking alcohol about one week earlier. (Tr. 736-40).

A Psychiatric Review Technique form was completed on August 28, 2006. (Tr. 612-24). The reviewer indicated that plaintiff had an affective disorder – major depressive disorder; a personality disorder, not otherwise specified, dependent traits; and a substance addiction disorder. The reviewer determined that plaintiff had no limitations on performing the activities of daily living, and mild limitations in the areas of maintaining social functioning and maintaining concentration, persistence or pace. The reviewer noted there were no repeated episodes of decompensation of extended duration. In the narrative portion, the reviewer noted that plaintiff's condition improves rapidly with treatment and detoxification during each hospital stay, and concluded that the majority of plaintiff's impairments are alcohol-related. The reviewer opined that without drugs and alcohol, plaintiff's mental limitations would be expected to be mild. Plaintiff's mental allegations were considered partially credible; his substance abuse disorder was material to the assessment. (Tr. 623).

## IV. The ALJ's Decision

---

[20]Dialantin, or Phenytoin, is an anticonvulsant used to prevent seizures. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Nov. 6, 2009).

In the decision issued on January 22, 2008, the ALJ made the following findings:

1.  Plaintiff meets the disability insured status requirements through December 31, 2010.

2.  Plaintiff had not engaged in substantial gainful activity since the alleged onset date.

3.  Plaintiff has the following severe impairments: alcohol dependence, treatment compliance problem, ankle and foot pain, hepatitis C, and major depressive disorder with a history of suicidal ideation.   His nonsevere impairments include hypertension, a seizure disorder, and a history of a surgically repaired ankle fracture, esophageal varices with bleeding, basal cell carcinoma, and cannabis abuse.

4.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  Based on all the impairments, including the substance use disorder, plaintiff has the residual functional capacity to perform sedentary work except he cannot understand, remember and carry out simple job instructions; maintain his attention and/or concentration, maintain regular attendance and be punctual, or sustain an ordinary routine without special supervision; interact appropriately with co-workers, supervisors and the general public; accept instructions and respond appropriately to criticism from supervisors, maintain socially appropriate behavior, relate predictably in social situations, behave in an emotionally stable manner, care for himself, meet personal needs, or deal with stress.

6.  Plaintiff is unable to perform his past relevant work.

7.  Plaintiff was fifty-five, which is defined as advanced age, on the amended alleged onset date.

8.  Plaintiff has at least a high school education and is able to communicate in English.

9.  Plaintiff's acquired job skills do not transfer to other occupations within the residual functional capacity defined above.

10. Considering his age, education, work experience,  and residual functional capacity based on all the impairments, including the substance use disorder, there are no jobs that exist in significant number in the national economy that plaintiff can perform.

11. If plaintiff stopped the substance use, the remaining limitations would cause more than a minimal impact on his ability to perform basic work

activities; therefore, plaintiff would continue to have a severe impairment or combination of impairments.

12. If plaintiff stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or medically equals any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

13. If plaintiff stopped the substance use, he would have the residual functional capacity to perform the full range of light work.

14. If plaintiff stopped the substance use, he would be able to perform his past relevant work as a security guard. The work does not require the performance of work-related activities precluded by the residual functional capacity plaintiff would have if he stopped the substance use.

15. Because plaintiff would not be disabled if he stopped the substance use, his substance use is a contributing factor material to the determination of disability. Thus, plaintiff has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of the decision.

(Tr. 13-28).

## V. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Serv. 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform his past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy. If the claimant is not, he is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

## A.    Standard of Review

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002), quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1. The ALJ's credibility findings;

2. the plaintiff's vocational factors;

3. the medical evidence;

4. the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5. third-party corroboration of the plaintiff's impairments; and

6. when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217, (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

**B.    Analysis**

Plaintiff contends that the ALJ erred in determining that his substance use disorder is a contributing factor to his severe physical and mental impairments.

"An individual is not considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002), (quoting 42 U.S.C. § 423(d)(2)(C)); see also Brueggemann v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003). Drug addiction or alcoholism is material

if the limitations that formed the basis of the Commissioner's disability determination would no longer be present if the claimant stopped using drugs or alcohol. 20 C.F.R. § 404.1535(b); 20 C.F.R. § 416.935(b) (supplemental security income).

The analysis requires the ALJ to first determine whether the claimant is disabled. Viers v. Astrue, 582 F.Supp.2d 1109, 1122 (N.D. Iowa 2008); see 20 C.F.R. 404.1535; § 20 C.F.R. § 416.935 ("If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability." (emphasis added)). "The ALJ must reach this determination initially . . . using the five-step approach . . . without segregating out any effects that might be due to substance use disorders." Brueggemann v. Barnhart, 348 F.3d 689, 694 (8th Cir. 2003)(citation omitted). This determination must be based on "substantial evidence of [the claimant's] medical limitations without deductions for the assumed effects of substance use disorders." Id.

If the ALJ concludes that the individual would be disabled based upon all limitations, the ALJ must then consider whether drug addiction or alcoholism is "material" to the determination of disability. This requires a two-step analysis. Rehder v. Apfel, 205 F.3d 1056, 1060 (8th Cir. 2000). First, the ALJ should determine which of the claimant's physical and mental limitations would remain if the claimant refrained from substance use. Id. Then, the ALJ must determine whether the claimant's remaining limitations would be disabling. Id. If the claimant's remaining limitations would not be disabling, the claimant's alcoholism or drug addiction is a contributing factor material to a determination of disability and benefits will be denied. Id. If the claimant would still be considered disabled due to his or her remaining limitations, the claimant is disabled and entitled to benefits. Id. The claimant carries the burden of

proving that alcoholism or drug addiction is not a material factor to the finding of disability.  Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (citing Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000)).

Plaintiff challenges the ALJ's determination that he can perform sedentary work while using substances and light work when substance-free.[21]  Plaintiff asserts that this determination is in error because the ALJ did not explain how substance use affects his physical limitations.  The decision detailed the numerous ways in which plaintiff's physical capacity is impaired by his alcohol consumption: in January 2006, he fell while intoxicated and fractured his left ankle, necessitating surgical repair with screws and plates.  In May 2006, while intoxicated, he complained that he had been suffering severe leg pain for several days; the emergency room doctor noted that the pain was relieved by removing the leg brace plaintiff had been wearing.  In July 2006, he sustained gashes to his scalp; shortly thereafter he required treatment of a broken finger.  These injuries all occurred because he fell while intoxicated.  By contrast, when plaintiff was sober, his gait was normal.  Periodic x-rays of his spine were unremarkable; physical examinations were similarly unremarkable.  No treating source has indicated that plaintiff's other medical conditions -- lacunar infarction, cirrhosis and hepatitis C -- are disabling or limit his functioning.  With respect to plaintiff's complaints of pain, the record reflects that the pain was effectively controlled by medication when he was compliant with treatment; as the ALJ noted, however, plaintiff is "notorious for noncompliance." (Tr. 566; 27).  Furthermore, plaintiff failed to seek treatment outside his trips to the emergency room; this is a legitimate basis for

---

[21]Sedentary work involves lifting no more than 10 pounds and is defined as one which involves sitting; jobs are sedentary if walking and standing are required occasionally.  Light work involves lifting no more than 20 pounds at a time; a job is in this category when it requires a good deal of walking or standing.  20 C.F.R. § 404.1567

discounting his complaints of disabling pain. McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The evidence on the record as a whole supports a conclusion that plaintiff's substance use had a material affect on his physical limitations. The ALJ's failure to state this explicitly is merely a deficiency in opinion-writing. Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999).

Plaintiff also challenges the ALJ's determination that his alcohol consumption was a contributing factor in his mental impairments. He contends that, because he has used drugs and alcohol his most of his life, it is impossible to confirm that he would have no mental impairments without substance use. As defendant notes, however, plaintiff retains the burden to establish that he would have disabling mental impairments if substance abuse were not a contributing factor.

Plaintiff points to his consistently low GAF scores as evidence that, even when he is sober, he has mental limitations that would render him disabled. The GAF reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000). Plaintiff was sober for very brief periods of time, during which he was still contending with the psychological, physical, and social effects of chronic alcohol abuse. Thus, it is not surprising that a reduction in blood alcohol level was not reflected in a concomitant rise in his GAF; plaintiff's continued low GAF scores are not conclusive evidence that he has an underlying mental impairment that would render him disabled.

Plaintiff next contends that the ALJ was required to apply the Medical-Vocational Guidelines and consult a vocational expert. This argument appears to be based upon the ALJ's determination that, when considering the effects of his substance use,

plaintiff would be incapable of performing his past relevant work.   See Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996) ("The testimony of a vocational expert is required when a claimant has satisfied his initial burden of showing that he is incapable of performing his past relevant work.").   The ALJ began the analysis anew when considering plaintiff's limitations without continued substance use.  Plaintiff cites to no authority for the proposition that the finding in the first analysis carries over into the second analysis.   Once the ALJ determined that plaintiff could return to his past relevant work if the effect of substance use was subtracted, there was no need to consult a vocational expert or to apply the Guidelines.  See Martin v. Sullivan, 901 F.2d 650, 653 (8th Cir. 1990) (consultation of guidelines or vocational expert not necessary where ALJ determined that plaintiff can return to past relevant work).

## VI.  Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.  Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in the brief in support of his complaint [Doc. #15] is **denied**.

A separate judgment in accordance with this order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 17th day of March, 2010.